We will call for oral argument the case of United States of America v. Jiminez. Mr. Zosmer, what do things look like over on that side of the courtroom? I'm not really accustomed to seeing... Your boss is not here today. That's true. He only comes when you want him to go. On the rare occasion when the government appeals, the one thing I do on the morning of the argument is repeatedly remind myself, that table, that table, so I don't make the mistake. Well, believe me, we would have reminded you. Exactly, and I didn't want that to happen. Good morning, Your Honor. May I please the Court? Robert Zosmer on behalf of the government. I'm here with that rare government appeal regarding a suppression order that was issued by the district court. With respect, there were two errors, two legal errors that were made by the district court, and correction of either one of them warrants reversal of the judgment. First, the court incorrectly concluded as a matter of law that this had been an arrest, as opposed to the Terry stop that it was. Would you do this, please, and then we've all read the briefs, of course, and know the record, but take us through the chronology here, because it is a little unusual, or at least it's a little detailed when you consider that you've got two individuals, I think four vehicles, several officers in several places. It's, for lack of a better characterization, it's not your typical stop or arrest of this kind. It's not, and I appreciate the question, because this appeal really is all about the underlying facts. The police had been sitting on this car for a day, because Officer Vargas had happened. What make was that car with the intercourage on it? The Jeep Cherokee. The Jeep Cherokee. So the Jeep Cherokee was, Officer Vargas saw that it had an aftermarket compartment. He told his task force. They decided to surveil the car. So happened, Officer Vargas saw this when he was on routine patrol. It happens that he's one of the national experts on aftermarket compartments, who testified that he's gone around the country training people on this, and what is found in such compartments. So they see this. He knows what's going on. They conduct surveillance all day long from 730 in the morning, and then at 445 sees that two gentlemen arrive, Mr. Jimenez and Mr. Baez, and they get into the vehicle. Now, there are now a number of officers seeing this, and Detective Henry has the best view. He sees really suspicious activity going on inside the Jeep Cherokee. The two men get inside. One of them goes underneath the dashboard, while the other crawls between the seats and goes into the rear of the vehicle, even though it would be easier to just walk around, open the latch at the back, and look inside at whatever it is you want to look at. And they spend about five minutes in these positions, and then they switch. The person who's in back goes under the dashboard. The person who's in front crawls between the seats. That goes on for another five minutes. And so already I think you probably have reasonable suspicion here. What happens then is they drive off in the Jeep Cherokee, and they drive it, both of them, and they drive it for about a minute and wind up parking the Jeep Cherokee just about a half block from where they started. They could have just made one turn in order to get there. Instead, they make several turns in a circuitous way, and the officers know what's happening here. This is classic counter-surveillance to make sure that nobody's following them or watching them. At that point, both gentlemen get out of the Jeep Cherokee, and they go and they leave in two different vehicles. They had arrived, I believe it was, in a Ford Explorer. They arrived together in the Explorer? They were together in the Ford Explorer. They depart in two different vehicles. Baez gets into a Ford Escape. The Explorer has an under-market car, too? No, there's no further information in the record about the Explorer that they had arrived in. Baez gets into the Ford Escape that's sitting there. Jimenez gets into a Ford Transit van. And so that's why, Judge Smith, I'm sure you referred to four vehicles we now have involved in this operation. So Vargas follows the Ford Escape that's being driven by Baez. Within a minute or so, he pulls him over. He says he got consent to search. The judicial court found that the government hadn't established that. But he does search the Ford Escape, finds an aftermarket compartment, finds cocaine and methamphetamine. At that point, he first knows of the aftermarket compartment. He didn't pick that up by observation? I'm not sure it matters. He said he wasn't sure when he pulled it over. And he said he couldn't be 100% sure until he actually pried open the carpet that had been glued down in the back of the Escape. So meantime, Mr. Jimenez, who had driven off in that Ford Transit van, returns to the area where the Jeep Cherokee is, where Detective Henry is still conducting surveillance. He gets out of the van, walks back to the Jeep Cherokee in its new parking spot. But along the way, he's looking into every car along the way, because he's still conducting surveillance to make sure there's nobody there. He then gets in the Jeep Cherokee again for the second time now, and he drives off. Detective Henry follows him. And I believe it's at about that moment. He's in another car. Henry is. That's right. He is. But it's at about that moment that Detective Henry hears on the radio from Officer Vargas that they have found drugs in the Ford Escape. So he follows them. This is in the course of Henry's following Jimenez that he learns of the stash being found in the car? It's not entirely clear, but it's either right before that pursuit starts, the second pursuit, or it's during it. But he hears the information by radio? He does. I think there's testimony. He hears it before Jimenez gets out of the car. He hears it. Oh, definitely. There's testimony that they actually have two radios they're using. They have the police-wide radio band, but these task force officers also have their own radios that they're communicating with each other on. And Vargas says that's how he's staying in direct touch with Henry throughout this. So Henry gets behind the Jeep Cherokee, which is now in motion, flashes his headlights to say he's there and he wants to stop the car, and instead Mr. Jimenez in the Jeep Cherokee takes off at 60 to 70 miles an hour in these narrow residential streets, barreling through several turns. Henry, this is just at sunset. It's shortly after sunset, so it's probably twilight at this point. And then he doesn't escape from Henry. He pulls over, gets out of the car. Henry gets out immediately from his car. He said he yelled police as loud as he could from about 10 feet away, and Jimenez takes off on foot. Henry's in uniform. He doesn't know the car is a Mark. Henry is, I don't believe, is in uniform. Okay. Vargas is the only one in uniform and the only one in a Mark vehicle. So Jimenez takes off on foot. Henry chases him for a bit, can't catch him, and he returns to the Jeep Cherokee, which is now abandoned, that Mr. Jimenez has left. Minutes later, he puts out a radio call, of course, and minutes later an off-duty police officer in the area finds Jimenez. Excuse me, Mr. Zosmary. Isn't there, maybe I missed this, isn't there a point in the chase by Henry Jimenez that Henry verbally identifies himself as police? Yes. As I said, when Jimenez gets out of the Jeep Cherokee after he's pulled over, Henry gets out of his car and says he yelled the word police as loud as he could, and at that moment Jimenez takes off on foot. So it's just that word. Just the word police. Got it. And so Jimenez runs and he's found hiding underneath a car about a block away by an off-duty police officer. That is announced on the radio, and so at that point Henry goes over to where they've apprehended Mr. Jimenez and identifies him as the person he saw driving the Jeep Cherokee. They then go back to the Jeep Cherokee and they call for a drug detection dog. They don't put anybody under arrest. They don't put Jimenez. Don't go there yet. There's an issue there. Okay. Well. Don't formally say you're under arrest. They do not formally say he's under arrest. Instead, they call for a drug detection dog, because they want to continue the investigation. Unfortunately, no dog is available, because unfortunately a police officer was shot at the same time in a completely unrelated incident elsewhere in Philadelphia, and all of the dogs. Not relevant, but I was puzzled. Maybe you can just help me if it's on the record. Why would a drug detection dog be used in a police shooting? It's two different kinds of dogs, isn't it? Well, there are, but I could just say from experience this is not in the And obviously when there is something. Glad someone's got a dog like that. But when there is an officer involved in a shooting, obviously you're going to devote all your resources to that. And so the dog is not available. That's undisputed in the record. Vargas makes a bunch of calls, gets a hold of another task force officer. Jimenez is cuffed now in the back of the police car. Exactly. At the scene next to the Jeep Cherokee. Eventually, at about 6.54, I think it is, a dog does arrive from the White Marsh Police Department, which is good enough to lend one of its dogs. The dog immediately alerts on the vehicle. They still don't search the vehicle. They still impound it and apply for a search warrant. And the search warrant is obtained around midnight. Why didn't they apply for a search warrant rather than waiting? Some of the time they had no idea how long it would take for a dog to come. You could get on the telephone and get a search warrant pretty quickly for that car. Couldn't you have given those facts? Well, I think they're following the ordinary procedure. But we also know from the record that the warrant wasn't obtained until midnight. So maybe that's something else that they know as to how long it would take to get a warrant. But I think the police should be commended here. They're following an orderly procedure in getting the drug detection dog. They get a dog, they get a warrant in that order. Exactly. Now, I would say, and I would have had no problem standing here arguing, that they could have searched that car without a warrant, without a dog, one minute after Jimenez took off. Elaborate on that. Well, based on the automobile exception. I mean, there is probable cause after everything I've described, with the aftermarket compartment, with the two guys going back and forth, with one of them being found with drugs in his vehicle, with somebody trying to escape at 60 to 70 miles an hour. You have probable cause to search that car. Let's stop right there, because you've expressed that with confidence, which may well be justified. So there are two threads in the briefing here, obvious ones. We have a Terry discussion and we have a PC discussion. Isn't the easiest course for the government here, simply to pursue the probable cause to arrest course and not have to explore the Terry stuff? If Your Honor believes that's the easiest, I'm happy to accept that. No, no, I would know it. You're the one standing there expressing confidence. I'm not always. Before you jump on that horse from either too far, as soon as probable cause to arrest him, how does that get you permission to search the car, unless you're relying upon that own ability exception, but that's a bit of a heavy lift, isn't it? Because that no longer, the carriage that they're interested in, is no longer within his control or reach. He's handcuffed in the police car. So if he's arrested, does that give you the right to search the car? Well, there would be two bases. I'll get back to Judge Smith's question in a minute, but there would be two bases. One would be the automobile exception that would permit the search of the car based on probable cause without a warrant. The second would be as a search incident to arrest. That's the point I might have problems with, because that's no longer within his reach, is it? That's right, but the Supreme Court case, and the name will come to me in a moment, the recent case on that, holds that you cannot search incident to arrest a vehicle that the person has left if he has been detained except to search for evidence related to the crime for which he's been detained. So under that recent Supreme Court decision, which is not in our brief, you would be able to do it as a search incident to arrest as well. Can you get us that with the 28J? Because I can't remember the case name either. I'll provide the site if that's right, Your Honor. I'll try to get it by rebuttal. In terms of the question of the easiest course here, I am speaking, I hope not with too much confidence, regarding both things here. This was a Terry stop under the Johnson decision in this court where the men are taken out of a taxi at gunpoint and handcuffed. But it potentially became, arguably, became a very, very long Terry stop. It was a very long Terry stop, and that's where we get... Which is why I suggest to you, isn't the better course for you the PC to arrest course? We feel very confident about that course as well, Your Honor, that there was probable cause based on the facts that I've described at length for the arrest, for the search, and therefore the suppression ruling was incorrect. Now, have you been able to get a search warrant to search the car after you impounded it without the positive alert from the drug dog? I believe so, certainly. I think that the evidence here, as we've said, supports probable cause for arrest and a search without the alert. Based on what's going on here with the aftermarket compartment and the activity in the Jeep Cherokee and Mr. Baez being found with drugs immediately thereafter, yes, there's probable cause without the dog alert. Is there anything in the record as to who the Jeep was registered to? I don't believe so. I don't believe so, Your Honor. There was a lot of testimony about the Ford Escape that Baez was driving that was in a different name, but no, I don't believe as to the Jeep Cherokee. Is there anything in the record about the procedures police would use? Let's assume they took the car in and impounded it, and they performed an inventory search, so they come in the inventory search exception. Is there anything in the record that would support it coming in via inventory search? That was not addressed. This was always addressed as being, again, a Terry Stopper alternatively probable cause. We would have needed testimony probably, as Your Honor knows, under the precedent regarding the police procedures that they follow. Well, you asked the question. And that evidence was not introduced. Okay. So it's basically take your pick. We really think it's very straightforward under both rationales. It's awkward when you see such a broad smile in your face, Mr. Zussman. He's getting used to that chair. It's just smiling at the honor of appearing before the court. A lot of the cases on Terry Stops talk about a temporary investigative detention. There's an argument here that what they should have done, rather than waiting for the drug dog, was to have asked Jimenez if they could search the car. Right. To try to get consent to search the car. Do you think there's any obligation under facts such as this that the police should ask for consent in order to shorten the Terry Stop? I don't believe any case has ever held, Your Honor, that the police have an obligation to ask for consent before following another permissible procedure. Our speculation here is that where you've just chased a guy for blocks and have to run him down, that they're not expecting to get consent from him. And instead they're following an orderly procedure, which is they're going to get the detection dog. And it's easy to look in hindsight here and say, yes, it took 80 minutes or what have you in order to get the dog. But that's hindsight. They don't know that. They're following a procedure in the ordinary course within 20, 30 minutes. There's some point in the course of that call they did know. It's not like, I think it was Leo, where they thought the dog was on its way to Zeus. I love that name. And unbeknownst to the arresting officer, the detaining officer, Zeus was detained because of bad traffic. And we said, well, that was reasonable because it was beyond the officer's control. He didn't know that when he radioed for the dog. Here, when the call was made for the dog, the police officer had reason to suspect, this could take a while to have the dog available. We've got to call all the surrounding townships. He didn't know how many townships they would have to call if any of them would have a dog available. That makes it a little bit different, but it doesn't, does it? Not much, Your Honor, I believe. The question always is reasonableness. And it was reasonable in Leal that Your Honor authored because the dog was delayed in traffic. It was reasonable in Frost for a similar amount of time because it was at the airport at night and it took over an hour for the dog to arrive. This is reasonable. They're making calls. They're waiting. And again, I do think the police conduct here deserves commendation. They're following an orderly procedure to step-by-step conduct their investigation, which proved unbelievably fruitful. It found, lawfully, a massive amount of narcotics in that Jeep Cherokee. Thank you. Thank you very much, Mr. Garza. Did you reserve time for rebuttal? I forgot. I thought I was going to reserve three minutes, but I didn't. Okay, thank you. Thank you. Mr. Narcisi. Your Honor, good morning. Your Honor, this is going to be a half of appellee. Your Honor, in listening to the Court's questions of counsel, the argument of Terry's stop versus a probable cause stop, I would submit to the Court that that is something of a Hobson's choice because I would argue that the Terry's stop was impermissibly long. On the other hand, the probable cause or the arrest was not supported by probable cause. Two areas that I would... I agree that the District Court was incorrect when she said the fact that he did not think he was free to leave makes it, ipso facto, an arrest. And that's pretty clear that that's not the law. Your Honor, I hold Judge Tucker in the highest regard. It's an objective standard, right? It's an objective standard. Yes, sir. And the belief of the officer could possibly be a factor in the overall consideration of circumstances, but it's an objective standard, right? Absolutely, Your Honor. Absolutely. Now, there are two issues that I'm concerned with. One, and I believe that Judge Tucker addressed this in her opinion, is what is the Court to do with the Baez arrest? Here we have the arrest of Baez, the individual who's driving the Ford Escape, the individual who, as a result of the stop and the recovery, the information was put out on the police radio, was used as the cornerstone or the start for the arrest of Mr. Jimenez. So the issue I submit to the Court, and I believe the judge addressed this was, quite simply, it needs particularized facts relating to Mr. Jimenez. But you just heard them. As far as the situation where Jimenez was arrested for merely being in the company of somebody who was in a car with a concealed compartment in which they find drugs, and this is a guy who's engaging in circuitous behavior with that individual, to put him in the car together, switching positions inside the car while they're being observed, they drive away together, this is more than a chance encounter or a mere presence situation. Your Honor, with all due respect, my recollection of the facts is as follows, that Baez and Jimenez were in the Cherokee together. We have no indication that there was anything in anyone's hand. No time during the course of their surveillance was anything visible in terms of being relocated. Agreed, they never exchanged hands. Your Honor, my issue is that at some juncture, Baez leaves. Baez goes to a silver escape. Jimenez has nothing to do with that silver car. Your Honor, if we are in… But the question is not what does Jimenez have to do with the silver car. The issue is, is it reasonable for the police to assume Jimenez has something to do with Baez, who has something to do with the silver car? And then add to that the fact that Jimenez drives around for four or five blocks to get a half a block away. Your Honor, I would submit that that is a rather tenuous link in this particular case because essentially then any citizen who interacts with another citizen and that second citizen goes and engages in some form of nefarious conduct, the initial or the underlying individual can then otherwise be stopped. Well, if you add some more juice into that syrup with these facts, possibly that is the case. The kind of surveillance that was described, it just doesn't make any sense. Why would anybody drive a car four blocks, five blocks? My clerk actually looked on Google Maps to see how far it was. It's right around the corner. Yes, sir. It takes them four or five blocks to get there. Does that make any sense unless you're concerned about somebody watching you? Well, why would you be concerned about someone watching your movements? All you do know, Baez, and Baez is tied to the car with the drugs, you would get to the point where an officer not only acts unreasonably in not making those associations, the officer becomes a total idiot if he or she doesn't make that association. What other conclusion could the officer draw other than there's something going on here I need to check out? Your Honor, it would be our position that the subsequent conduct of Baez, the subsequent operation of the vehicle because, and I would suggest that it's impermissible to impute any knowledge as far as the contents of this Ford Escape. Let's forget the Ford Escape then. That's causing us confusion. The Ford Escape doesn't exist. This is just a gentleman walking down the street, gets into a car which appears to have a compartment under it that some people think some other folks might use to conceal drugs or weapons. He does some weird things in that car. He doesn't know somebody else, but let's forget that guy. He then does this weird little pirouette with this car where he goes four or five blocks to go half a block. He gets into another car. He's then pursued by a car which flashes the lights in that I will concede. If I'm in that particular city in a car, an unmarked car, starts flashing the lights at me, I'm going to take off too. But anyway, he takes off, he runs. So you can explain that by just this guy does not know who's chasing him, except for the fact somebody yells police officer before he runs. I even concede, well, if you're in plain clothes and you yell police officer, I'm not buying that. I'm out of here. But then what about the fact, and this hadn't hit me until Mr. Zalsmer glanced over the wood, abandoned. Why isn't that car abandoned once he gets out, takes off and leaves it there? Why isn't the car abandoned? If it's abandoned, why can't the police go in and search it even without a warrant under the vehicular exception? Because I would submit to Your Honor that the record is silent regarding the status of that Cherokee when Mr. Jimenez gets out of it. All right, Mr. Jimenez. We know nobody's in it. We know no one's in it. Yes, Your Honor. However, there's nothing to indicate that the vehicle was left with the engine running and the doors open in the middle of the street. There's nothing to indicate the status of the vehicle. I would submit to Your Honor that if the vehicle were abandoned, that there should be a little bit more in terms of the development of the facts. And I think that was the problem that the trial court had with that issue because there was nothing otherwise to indicate. And, Your Honor, and again, with the utmost of respect, the officer, Detective Henry, yelled police. He did not yell police officer. And I would submit to the court that that is. Whoa, whoa, whoa. You're just making some really, really good arguments. I'm sorry. Kid Black Eisen fell right on your butt. You know what you're saying? He yelled police. He didn't yell police officer? Yeah. He also didn't say I am a. What difference does it make? Your Honor, I would submit to the court that one could be construed as a call for help, and one could be construed as an identification of a person of authority. That would be my argument in that regard, Judge. Okay. Judge, I had the same problem with my wife, so, you know, in terms of over-arguing. So I apologize for that. Counselor. Yes, sir. When they finally handcuffed him and us, okay, did the government have, did the police have reasonable suspicion to hold him at that time? Because in your brief, you do not attempt to refute the government's argument that there was reasonable suspicion. Your Honor, because it would be our contention, and this goes to the argument regarding the failure to introduce the officer who ultimately secured Mr. Jimenez, I would submit to the court that at the time that, when Mr. Jimenez was handcuffed, that he was arrested, and that the appropriate standard is one of probable cause. But you didn't answer my question. Yes, sir. I would submit that there could be an argument made for reasonable suspicion. You acknowledge that there could be reasonable suspicion? Yes, Your Honor. Okay. I mean, in all candor to the court and the tribunal, yes, I mean, that's entirely possible. All right. So if that's the case, what did the police do wrong after that? What did, okay. What did the police do wrong after that? They have him there. Now, you know, they handcuffed him. They put him in the car. I don't know where else, what else they would do with him but put him in the car. He had already fled, okay, so there was a flight risk there. I think you could say that. So what did the police do wrong after that? Your Honor, I think the error, and this is, I would argue, consistent with the holding in Rodriguez, is the holding in Rodriguez, the keeping of my client in the back of a vehicle, handcuffed for approximately one hour and 40 minutes, waiting for this dog. I think it's a disjuncture, Judge, and I think the error, in order to fully elaborate on the error, I think we need to put this in context of the surveillance that took place prior to that. All right, if we have Detective Vargas and his testimony regarding the surveillance of the vehicle, ample opportunity to investigate further as far as the vehicle is concerned. The courts may be aware that in the transcript there was discussion regarding the auctioning off of vehicles with aftermarket compartments, certain other steps that needed to predicate or be based. What were they? Yes, sir. What were those certain other steps? What should they have done? What should I have done? Your Honor, you know what? I think they should have run the VIN. I think they should have run the VIN. It's on the windshield, it's readily apparent, and it's done for a reason. What does that get you? Run the VIN. Run the VIN. What does that get you? What does that prove? What does that prove, Judge? I think from there you're able to get a chain of title. Then you're able to see, hey, was this vehicle auctioned off? What's the background on this vehicle? Because there was ample testimony in the record regarding the fact that the compartment could have been put in after it was auctioned off. Either he owns it or he doesn't own it. If he owns it, you're in exactly the same situation you are before you radio in the VIN. If he doesn't own it, you're in exactly the same situation you are when you radio in the VIN because somebody could have flown in the car. He could be driving it with the owner's permission. The fact he doesn't own it doesn't mean that it's a stolen car. It's not reported stolen on this record. So I don't know what radioing in the VIN gets you. I'm sorry, Judge. I didn't mean to imply, and I apologize if I was unclear, that as far as the VIN is concerned, just to determine if the vehicle had been auctioned off prior to the city. Because Detective Argus testified that the city of Philadelphia routinely auctions off vehicles with aftermarket compartments. That was something that was testified to at law. Yeah. One more time and then. What does that do to help you? Because what it does, I would submit to Your Honor, what it does is it moves from the whole idea that driving or operation of a vehicle with an aftermarket compartment, you can per se impute knowledge or illicit activity. What you're saying is before they auction them off, they seal the aftermarket compartment. Yeah. That's what you're saying. Yes, sir, Your Honor. Okay. And just simply. Yeah, but the police didn't know that. All they see is an aftermarket compartment. It doesn't make any difference. They don't know whether the aftermarket compartment's been sealed and then unsealed or whether it was an aftermarket compartment that had been installed. Your Honor, I agree. But at the very least, I would submit to the court it's a de minimis computer background check to run it. That's all. And I would submit to the court that that is not an owner's burden. I can't tell you anything. No, we still have a jury stop. And then what do you do with that? What do you do with them after you get that information? Still have a jury stop. It's taking a little more time to do the VIN check. What does the officer do after that? While we're waiting for the dog to arrive, Judge? Well, forget the dog. I'm just trying to figure out what the officer should have done. You said VIN check. Okay. Should have done that. I'm not sure that changes the equation. Still have a jury stop. You know what, Your Honor? One of the issues that I had was because we heard regarding the reasonableness of the police and their conduct here and that they were following procedure. One of the things that stood out for me was that there was ample testimony regarding the consent or the attempt to request consent from Mr. Baez. But there was nothing in that regard as far as any kind of communication or discussion with Mr. Rodriguez. And I would submit to the court that in that situation, had they done that, then the whole time frame, that potentially could have obviated the need for the dog at all. It could have said, hey, you know what, do you want to get out of here? Fine. Let us search the car. He says yes. He says no. And you say, do you want to get out of here? Let us search the car. And he says, have you not been watching, officer? Did you see me just take off and haul ass when you got up and told me you're a police officer? You think I'm going to allow you to search my car with my consent? What year did you graduate from the academy? Then where are you? But, you know what, Your Honor, in terms of the flight, I think the flight judge, that is arguably a reasonable apprehension on the part of Mr. Jimenez. I hear that. And, Your Honor, I cited at length in my brief the statute that Detective Henry was talking about here in terms of flight issues. And, again, going back to Your Honor's discussion regarding an objective standard here, you know, when we're looking at objectivity here, you know, objectively, what did Detective Henry do? He went up and he flashed his lights at Mr. Jimenez, and Mr. Jimenez took off. I submit when looking at that objectively, that's perfectly appropriate. And that's part of my – What about when he says police? When he says – Does that change your objective? What it does, Your Honor, I think is – And he's paid a badge. I think the record says he's paid a badge. You're saying, police officer, I'm going to probably get out of there too, but if you show me the badge, I might react very differently. What I think, Your Honor, in answer to Judge Fischer's question, what I think that does, Your Honor, is to a degree it diminishes the weight in terms of what weight we should give to the flight. So then he goes – he doesn't exactly run home. No. Or run to the library. Hiding under a car. Hiding under a car. Yes, sir. Yeah. Yes, sir. Not exactly the most innocent conduct. Your Honor, you know what? Or is it someone who is concerned for his own safety and well-being? From the police. Well, as Judge McKee had mentioned, that this is probably not the politest of neighborhoods. And perhaps, you know, a reasonable apprehension of fear. We have a situation here where he's being approached at dusk by an unknown individual with no displays of authority, no indicia. I mean, there wasn't even any lights behind the grill as far as this is concerned. Your Honor, I see my time is brief, though I would like to leave on this final point, and that is just that we heard testimony regarding Detective Vargas being a foregone national expert. Two things I would ask the Court to consider. One, that that was adequately addressed on cross-examination. And respectfully, I would ask the Court to consider, you know, when making its decision regarding just exactly what weight to give an aftermarket compartment, consider that it is not a fait accompli in terms of criminal conduct. Thank you. Mr. Zosmer, you have rebuttal and we'll see if we can get through it without Judge McKee supplying yet another synonym for one's posterior, which he managed to accomplish several times in the last few minutes. I'm going to avoid the legal terms. Just a few quick points. First of all, the decision I was referencing regarding search incident to arrest is Arizona v. Gantt. It's 556 U.S. 332, 2009 decision. That is one where Gantt is put in the back of a police car, put in the driveway. Right, and it reverses, I think it's Bolton v. New York that it reverses in holding that. Once he is detained, you can no longer go back into the vehicle because it's not within his reach, except to search for evidence relating to the purpose of the arrest. And that would be the case here, but it's not the case here because they instead were following a Terry procedure. Second point, they did run the VIN of the car. There's testimony from Officer Vargas that he ran the numbers of several vehicles on the block. It actually increased his suspicion because he found something like six vehicles which didn't register to the neighborhood, including the Jeep Cherokee, and one other car had an aftermarket compartment. So they were suspicious, and that's why the whole task force is out there. They don't spend... On that block where the Cherokee was? Right. There were six cars that were not from the neighborhood. There were two, including the Cherokee, that had an aftermarket compartment. This whole task force... Did they run the VIN or did they run the license plate? I'd have to go back and look at the record, Your Honor. It's in Officer Vargas' testimony under WAC near the beginning of the transcript. It may just be the license plates. Yeah. The license plate would show residents. The VIN wouldn't necessarily show residents. No, and I'm not sure that immediately the VIN would show the whole history, as my friend has suggested. I'm not sure that that's what would happen. But they did their investigation, and they decided this was something serious happening on this block, and that's why they sat there that day. And the final point I'd like to make, I know it's well known to the court, is that we could sit here all day coming up with innocent explanations of things, and that's not what happens in either a Terry or probable cause analysis. Is it possible he didn't think he was a police officer? Sure. Is it possible when he yelled police he thought he was fake? It's possible. Is it possible that this was one of the aftermarket compartments that doesn't have drugs? All of this is possible, but what we have to do, as this court and the Supreme Court have reminded over and over, is look at the totality of the circumstances, give credit to officers' judgment in being able to reach assumptions based on their experience, and not require that they eliminate every possible innocent explanation. Here, once you pile it all together, the innocent explanations sort of vanish anyway, and there's very clear reasonable suspicion or probable cause. Thank you very much, Mr. Gosnell. Thank you to both the counsel for your arguments and your briefing. We'll take the matter under advisement.